# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DERRICK CLY,

      Plaintiff,

v.                                 No. 1:21-cv-00202 RB/KK

FARMINGTON POLICE DEPARTMENT,
an agency of the City of Farmington; CITY OF
FARMINGTON, a political subdivision of the
State of New Mexico; CIERRA MANUS,
NATHAN MCPHERSON, and PARKER WHITE,
all personally and as law enforcement officers
employed by the City of Farmington,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On December 26, 2020, Defendants Nathan McPherson and Cierra Manus were dispatched to locate Plaintiff Derrick Cly's vehicle after the Farmington Police Department (FPD) received a tip that Cly might be Driving While Intoxicated (DWI). McPherson located the vehicle and conducted a traffic stop. McPherson asked Manus, a Drug Recognition Expert, to assist with the stop. Manus conducted three field sobriety tests and observed several signs of impairment. She also observed Cly swaying, sweating, and trembling. As a result, Manus arrested Cly for DWI. Manus took Cly for a toxicology test and booked him into jail. The blood test later revealed that Cly had no drugs or alcohol in his system. Rather than dismissing the case, the city attorney eventually filed a *nolle prosequi*.

On February 18, 2021, Cly filed a "Complaint for Damages for False Arrest, Unlawful Search, Wrongful Imprisonment, Malicious Prosecution, Failure to Properly Supervise and Train Police Officers, Racial Targeting and Discrimination, and Violation of Civil Rights Pursuant to 42 U.S.C. § 1983" in state court. Defendants removed the lawsuit to this Court and now move for

1

summary judgment. Defendants also move to strike several exhibits Cly attached to his response brief. For the reasons outlined in this Opinion, the Court will grant in part the motion for summary judgment and deny the motion to strike as moot.

## I.    Statement of Facts

On December 26, 2020, Cly, a resident of Farmington and an employee of the United States Postal Service (USPS), became ill, vomited at work, and decided to go home early. (*See* Doc. 1-A (Compl.) ¶¶ 1, 10–11; *see also* Doc. 28 ¶ 9.) Cly's supervisor, Tyler Marquart, called the FPD and reported that his employee "appear[ed] to be under [the] influence of something." (Doc. 33-8.) Marquart told the dispatcher Cly's name, identified Cly's vehicle make, model, and color, and provided his license plate number. (*Id.*) He said that Cly was vomiting and smelled of alcohol and would not answer when Marquart asked him if he was drunk. (*Id.*) Marquart sent Cly home for the day and asked Cly to call for a ride, but Cly refused. (*Id.*) Marquart saw Cly sitting by his vehicle in the employee parking lot. (*Id.*) Marquart gave dispatch his own name, work address, and phone number. (*Id.*) The dispatch notes identify the "call type" as a "welfare check." (*See id.*)

McPherson and Manus, both officers with the FPD, were "dispatched to locate a silver Buick in reference to a possibly intoxicated driver." (Docs. 28 ¶¶ 2, 5; 29 ¶¶ 2, 4.) The officers were aware that the reporting party stated his employee "smelled of alcohol and was vomiting next to his car." (Docs. 28 ¶ 6; 29 ¶ 6.) McPherson saw "Cly's vehicle leave the post office and [he] conducted a traffic stop." (Doc. 29 ¶ 6.) McPherson contacted "Manus, a trained Drug Recognition Expert, and referred the stop to her." (*Id.* ¶ 8; *see also* Doc. 28 ¶ 3.) Manus arrived shortly

thereafter, and McPherson observed while Manus conducted field sobriety tests.[1] (Doc. 29 ¶ 9; *see also* Doc. 33-2(B) at 0:00:04-0:00:18.[2])

Manus identified herself to Cly "and explained why he had been pulled over." (Doc. 28 ¶ 9; *see also* Doc. 33-2(B) at 0:00:34–0:00:45.) She "observed that [he] was shaking with tremors." (Doc. 28 ¶ 10.) She asked Cly if he'd had anything to drink, and he responded that he drank a mango tea from Taco Bell that made him nauseous. (*Id.* ¶ 9; Doc. 33-2(B) at 0:00:46–0:01:28.) Cly denied taking any prescription medications or that he had any "physical defects" or other medical issues that would affect his ability to take field sobriety tests.[3] (Doc. 33-2(B) at 0:02:14–0:02:25.)

Manus's body camera footage shows that there was ice in some areas of the parking lot. (*See, e.g.*, *id.* at 0:01:40.) Manus stated that she did "not want to do [the field sobriety tests] near the ice" and moved Cly to stand in a different area of the parking lot "where it's level." (*Id.* at 0:02:33–0:02:39.) She then asked him to move farther back away from a dip in the parking lot. (*Id.* at 0:02:45–0:02:52.) Manus testified that she conducted all the field sobriety tests "on a level

---

[1] Defendant "Officer Parker White was originally dispatched to" locate Cly's vehicle, but Manus "cancelled him when [she] responded." (Doc. 28 ¶ 18.) Because he was already in the area, he stayed to provide backup but "did not participate in the administration of the Standardized Field Sobriety Tests . . . ." (*Id.*)

[2] Cly's Exhibit 2 is a DVD that contains three video files. The second file, marked "CierraManus_202012261602_VXL1005110_64549211," contains footage from Manus's lapel camera, and the Court refers to it as Doc. 33-2(B). Cly's Exhibit 1 is a DVD that contains four folders of video files. In the first folder, labeled "NathanMcPherson 202012261600 9845 202118815," the subfolder labeled "Stream 2" contains McPherson's dash camera footage, which the Court refers to as Doc. 33-1(A)(2). The second folder, labeled "NathanMcPherson 202012261600 WFC1060868 106599123," contains McPherson's lapel camera footage, and the Court refers to it as Doc. 33-1(B).

[3] Cly disputes this fact, stating that "[t]he officers were aware that [he] was sick and suffering from food poisoning . . . ." (Doc. 33 at 5.) Yet, the body camera footage shows that during the encounter, Manus asked Cly if he had any conditions that would affect his ability to perform the test and he said that he did not. (Doc. 33-2(B) at 0:02:14–0:02:25.) The Court agrees that the officers had knowledge from dispatch that Cly had vomited, and he did tell them that the mango tea he drank made him feel sick. (*See id.* at 0:00:46–0:01:28.) Cly fails, however, to show any factual dispute on the question of whether he disclosed any condition that would affect his ability to perform the field sobriety tests.

surface, without incline."[4] (Doc. 28 ¶ 12 (citing Doc. 28-A).) The video footage confirms that Manus moved Cly to an area that was free of ice, large cracks, or other defects. (*See, e.g.*, Doc. 33-2(B) at 0:02:41–48, 0:03:06–08, 0:05:35–0:06:03, 0:08:44–0:09:02.) Some slight cracks run through the pavement in the area where Manus performed the field sobriety tests, but the cracks appear to have been patched. (*See id.*) McPherson's body camera footage confirms that the parking lot was free of ice or substantial defects. (*See, e.g.*, Doc. 33-1(B) at 0:04:10–19, 0:07:20–0:08:24.)

The first test Manus performed was the Horizontal Gaze Nystagmus (HGN) test. (*See* Doc. 33-2(B) at 0:02:53–0:04:43; *see also* Doc. 28 ¶ 12.) She directed Cly to remove his glasses and to stand with his feet together and his hands at his sides. (Doc. 33-2(B) at 0:02:53–0:03:08.) Manus told him to follow the tip of her finger with his eyes only; she reminded him twice during the test to refrain from moving his head. (*Id.* at 0:03:09–0:04:43; Doc. 28 ¶ 13.) Manus "observed no signs that [Cly] was impaired" during the HGN test. (Doc. 28 ¶ 13.) After the test, Manus saw Cly shaking and having tremors and asked him if he was ok. (Doc. 33-2(B) at 0:04:43–0:04:51.) He replied that he was shaking because he got pulled over and affirmed that he was neither under the influence of any drug nor had a medical condition that caused the tremors. (*Id.* at 0:04:52–0:05:09.)

---

[4] Cly disputes this fact and argues that the surface on which Manus administered the field sobriety tests was "cracked, icy, and sloping." (Doc. 33 at 6.) He offers several of his own photographs (*see* Docs. 33-3–6), which Defendants move to strike. (*See* Doc. 35.) Even if the photos are admissible, they are insufficient to create a genuine factual dispute on this issue. The Court finds that McPherson's dash cam and lapel video footage, which show a wider angle of the entire interaction, is more helpful in assessing the condition of the parking lot where Manus performed the field sobriety tests. (*See* Doc. 33-1(A)(2); 33-1(B).) For example, McPherson's lapel video shows that during the OLS test, Cly stood on pavement that appears level and free of ice or cracks. (*See* Doc. 33-1(B) at 0:09:01.) It also makes clear that Cly had trouble on the WAT test regardless of whether he was walking in an area of the parking lot marked with cracks. (*See id.* at 0:07:54–0:08:24.) McPherson's vehicle dash video confirms that the parking lot does not noticeably slope. (*See* Doc. 33-1(A)(2) at 0:04:30–0:12:30.)

Cly also notes that Manus slipped on ice when searching Cly's car. (*See* Doc. 33 at 6 (citation omitted).) This was not, however, the same area of the parking lot where Manus administered the field sobriety tests. "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, the plaintiff's version of the facts must find support in the record." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quotation omitted). The Court finds that Cly fails to support his version of the facts, and thus there is no genuine factual dispute on the issue of whether Manus conducted the field sobriety tests on a surface that was level and adequately free of defects.

Manus next conducted the walk and turn (WAT) test. (*Id.* at 0:05:10–7:00; Doc. 28 ¶ 14.) She gave Cly the option of using a painted line on the parking lot or an "imagined" line in front of him; he chose an imagined line. (Doc. 33-2(B) at 0:05:10–0:05:19.) Manus demonstrated how to stand in the "administrative position" and instructed Cly to do the same. (*Id.* at 0:05:20–0:05:40; Doc. 28 ¶ 14.) Cly "stepped out of the administrative position multiple times." (Doc. 28 ¶ 14; *see also* Doc. 33-2(B) at 0:05:20–0:05:40.) Manus explained and demonstrated how to perform the WAT test. (Doc. 33-2(B) at 0:05:40–0:06:21.) Cly performed the WAT test, and Manus observed four signs of impairment. (*See id.* at 0:06:22–0:07:00; Doc. 28 ¶ 14.) She noted on the Statement of Probable Cause that Cly's "arms were raised higher" than was appropriate for the test, he "missed heel to toe and stepped offline throughout the entire test[,]" and "[h]e almost fell over during the test . . . ." (Doc. 28-A.)

Finally, Manus performed the one leg stand (OLS) test. (Doc. 28 ¶ 15; Doc. 33-2(B) at 0:07:27–0:09:10.) Manus explained how to stand for the test. (Doc. 33-2(B) at 0:07:27–0:08:38.) Cly had put his hands in his pockets, and Manus directed him to keep his hands at his sides, commenting, "I know it's cold." (*Id.* at 0:07:27–0:07:39.) Manus noted that during the test "Cly placed his foot down multiple times, swayed[,] and" failed to keep his arms in "the proper position. (Doc. 28 ¶ 15; Doc. 33-2(B) at 0:08:38–0:09:10.) Manus "observed three signs of impairment." (Doc. 28 ¶ 15 (citing Doc. 28-A).)

Manus advised Cly that she believed he was under the influence of something based on the results of the field sobriety tests. (Doc. 33-2(B) at 0:09:11–0:09:19.) She asked him whether he was under the influence of alcohol or drugs, and Cly responded that all he had to eat or drink that day was tacos and the mango tea. (*Id.* at 0:09:20–0:09:39.) Manus stated in her report that she observed that he "was sweating profusely and his legs continued to tremor." (Doc. 28 ¶ 16.) "Based

on [her] observation of [his] performance in the field sobriety tests and [her] knowledge and experience as a Drug Recognition Expert, [she] believed" that Cly was impaired. (*Id.* ¶ 17.) Cly consented to have his blood drawn. (*Id.* ¶ 19.) Manus booked Cly into jail for DWI (1st offense). (*Id.* ¶ 22.) The toxicological results of the blood test showed that no drugs or alcohol were detected in Cly's blood. (*See* Doc. 33-10.)

Neither Manus nor McPherson was responsible for Cly after he was booked into jail, and neither "participate[d] in any decisions regarding the prosecution of the criminal case." (Docs. 28 ¶ 24; 29 ¶ 12.) The officers searched Cly's person and performed a tow inventory of his vehicle after they arrested him. (*See* Docs. 28-A; 29 ¶ 10; 33-2(B) at 11:25–12:28, 16:46–19:35.)

On February 18, 2021, Cly filed a Complaint for Damages for False Arrest, Unlawful Search, Wrongful Imprisonment, Malicious Prosecution, Failure to Properly Supervise and Train Police Officers, Racial Targeting and Discrimination, and Violation of Civil Rights Pursuant to 42 U.S.C. § 1983 in the Eleventh Judicial District Court, San Juan County, State of New Mexico. (Compl. at 1.) He makes three broad claims: Count I: false arrest, wrongful imprisonment, and malicious prosecution (*id.* ¶¶ 55–59); Count II: failure to supervise, instruct, and train police officers (*id.* ¶ 60); and Count III: violation of civil rights pursuant to 42 U.S.C. § 1983 (*id.* ¶¶ 61–65). Defendants move for summary judgment on all claims. (Doc. 27.)

## II.    Legal Standards

### A.    Summary Judgment Standard

"Summary judgment is proper if, viewing the evidence in1 the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckab*y, 902 F.3d 1136, 1143 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)).

A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id.* "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner v. San Juan Cnty. Sheriff's Off.*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* at 1107 (quotation and citation omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

### B.    Qualified Immunity Standard

The Court reviews summary judgment motions based on a qualified immunity defense somewhat differently. *See Halley*, 902 F.3d at 1144. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed

the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct [was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (internal quotation marks omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d at 1144 (quoting *Thomson*, 584 F.3d at 1312).

## III.   Analysis

Cly's claims stem from the premise that the officers had neither reasonable suspicion to conduct a traffic stop nor probable cause to arrest him. (*See* Compl. ¶ 47; Doc. 33 at 11.) Thus, the Court will first resolve these key issues.

### A.   McPherson had reasonable suspicion to detain Cly.

"The Tenth Circuit views an ordinary traffic stop as analogous to an investigative detention." *Ray v. N.M. State Police*, No. 1:20CV00127_JMC/GJF, 2021 WL 1169710, at *3 (D.N.M. Mar. 26, 2021) (citing *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995)). An investigative detention requires that an "officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause."

*Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000)). "[U]nder the Fourth Amendment, a valid traffic stop occurs if the officer observes a traffic violation or the officer has a 'reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" *Ray*, 2021 WL 1169710, at \*3 (quoting *Botero-Ospina*, 71 F.3d at 787).

McPherson had reasonable suspicion to conduct a traffic stop because of the information Marquart provided to dispatch. New Mexico law "proscribes driving while impaired to the slightest degree." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1207 (10th Cir. 2008) (citing N.M. Stat. Ann. § 66-8-102(A) ("It is unlawful for a person who is under the influence of intoxicating liquor to drive a vehicle within this state."); *New Mexico v. Neal*, 176 P.3d 330, 336–38 (2007)). And a citizen's report, if it "exhibits sufficient indicia of reliability[,]" may provide reasonable suspicion to conduct an investigatory stop. *See United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011) (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)).

> Whether a tip provides reasonable suspicion to make a traffic stop is case-specific. Although no single factor is dispositive, relevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*Id.* (citing *United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007); *United States v. Brown*, 496 F.3d 1070, 1078–79 (10th Cir. 2007)).

Here, the informant was not anonymous but identified himself to dispatch by name and gave his phone number and place of employment. (*See* Doc. 33-8.) Marquart gave contemporaneous, detailed, firsthand knowledge about Cly's condition. (*Id.*) He stated that Cly smelled of alcohol, that he had vomited during his lunch break, that he did not answer when

Marquart asked if he was drunk, and that he was in the employee parking lot sitting by his vehicle. (*Id.*) Marquart's motivation was his concern that Cly would drive while intoxicated. (*See id.*) McPherson corroborated Cly's location, as he saw Cly pull out of the USPS parking lot. (Doc. 29 ¶ 6.) Under these circumstances, the Court finds that the tip to dispatch "was sufficiently reliable to establish reasonable suspicion" and McPherson was justified in conducting the traffic stop. *See Chavez*, 660 F.3d at 1222 (citing *Copening*, 506 F.3d at 1247).

Cly does not dispute that the tip here was reliable, but instead argues that the presumption of reliability was "overcome" by "special circumstances." (Doc. 33 at 13 (citing *Brown*, 496 F.3d at 1075).) He argues that because McPherson did not personally observe any signs of intoxication (i.e., impaired driving or an odor of alcohol), any reasonable suspicion garnered from Marquart's tip dissipated and McPherson was required to terminate the detention. (*Id.* (citing *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1221 (10th Cir. 2020); *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998)). The Court disagrees that reasonable suspicion dissipated after McPherson stopped Cly. "If the officer's conduct during the stop is reasonably related to the circumstances justifying that stop, the officer may continue that conduct until 'the purpose of the stop is satisfied and any underlying reasonable suspicion [is] dispelled.'" *Amundsen v. Jones*, 533 F.3d 1192, 1199 (10th Cir. 2008) (quoting *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006)).

In *Amundsen*, an officer (Jones) conducted a traffic stop of a driver (Amundsen) after she saw her weaving between lanes. *Id.* at 1198–99. The parties disputed whether Jones saw other indicia of intoxication when she spoke with Amundsen. *See id.* The Tenth Circuit found that although there was no evidence that "Amundsen's behavior *during the stop*" provided "*additional* evidence of impairment," neither was there evidence "that Amundsen's conduct *dispelled* Jones's

earlier suspicions of intoxication." *Id.* (citing *United States v. McSwain*, 29 F.3d 558, 561–62 (10th Cir. 1994) (holding that an officer violated the Fourth Amendment because the reasonable suspicion of a traffic violation regarding a temporary registration sticker completely dissipated when the officer approached the car and determined the sticker was valid); *United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir. 1992) (holding that an officer impermissibly expanded the scope of a stop after a search of the vehicle completely dispelled the reasonable suspicion of illegal alien trafficking)). Consequently, because "the purpose of the initial stop was, at least in part, to investigate a reasonable suspicion that Amundsen was driving under the influence[,]" the officer's decision to use "field sobriety tests to determine whether Amundsen was in fact intoxicated did not exceed the scope of the stop." *Id.* at 1199–1200 (citations omitted).

The same is true here. Cly argues that because McPherson failed to observe erratic driving or other indicia of intoxication, he "should have released [Cly] to go home and treat his illness." (Doc. 33 at 12–13.) Based on Marquart's call to dispatch, however, McPherson had reasonable suspicion to detain Cly for driving under the influence. Cly fails to demonstrate that his "conduct *dispelled* [McPherson's] earlier suspicions of intoxication[,]" and the Court finds that McPherson's decision to conduct field sobriety tests "did not exceed the scope of the stop." *See Amundsen*, 533 F.3d at 1200 (citations omitted); *see also Wilder v. Turner*, 490 F.3d 810, 815 (10th Cir. 2007) ("A field sobriety test is a minor intrusion on a driver only requiring a reasonable suspicion of intoxication and 'an easy opportunity to end a detention before it matures into an arrest.'") (quoting *Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006)) (subsequent citation omitted). As Cly fails to show a constitutional violation, the officers are entitled to qualified immunity for their decision to stop Cly and conduct field sobriety tests.

Moreover, Cly cites no authority to support his theory that reasonable suspicion dissipates immediately in circumstances like those here. Thus, even if he was correct and McPherson violated his constitutional rights, the officers would be entitled to qualified immunity for their decision to go forward with field sobriety tests. *See, e.g.*, *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.") (quotation omitted).

### B.      Manus had probable cause to arrest Cly.

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Ray*, 2021 WL 1169710, at *4 (quoting *United States v. Valenzuela*, 209 F.3d 1179, 1185 (10th Cir. 2000)). "Probable cause does not require facts sufficient for a finding of guilt; however, it does require more than mere suspicion." *Id.* (quoting *United States v. Morris*, 247 F.3d 1080, 1088 (10th Cir. 2001)). "Using an objective standard, the court asks 'whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer.'" *Id.* (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002)).

In *Titus v. Ahlm*, an officer (Ahlm) conducted a traffic stop of a driver (Titus) for running a red light. 297 F. App'x 796, 797 (10th Cir. 2008). Titus "performed poorly on at least two" field sobriety tests. *Id.* at 798. Ahlm asked Titus "to take a portable breath alcohol test," but Titus declined and requested "a breath test from a calibrated and certified machine at the police station." *Id.* at 798–99. "Ahlm arrested . . . Titus and transported him to the station" to conduct the breath

test. *Id.* at 799. While Titus did not dispute the validity of this initial arrest, the Tenth Circuit noted that it was "clear Officer Ahlm possessed probable cause to arrest Mr. Titus." *Id.* at 800 (citing *Wilder*, 490 F.3d at 815).

Here, Manus conducted three field sobriety tests on a level surface free of any substantial defects. Cly showed no indicia of intoxication during the HGN test but showed multiple signs of impairment during the WAT and OLS tests. (*See* Doc. 33-7.) Manus also observed that Cly was sweating and shaking with tremors, which indicated to her that he was impaired. (*See id.*) Cly argues without citing Tenth Circuit authority that when Manus saw no signs of impairment on the HGN test, she erred in failing to administer "drug-specific tests" as described in the Participant Manual of the NHTSA Drug Recognition Expert Course. (Doc. 33 at 15–16 (citing Doc. 33-13).) He attaches two pages from the Participant Manual as an exhibit to his response brief, but the material does not support his position. (*See* Doc. 33-13.) The first page is titled "Live Demonstrations" and merely lists three types of eye examinations; four psychophysical tests; and three vital signs examinations. (Doc. 33-13 at 2.) The second page, titled "Evaluation of Subjects Under the Influence of CNS Depressants," presumably describes what examination results officers should expect in testing an individual who is under the influence of "CNS Depressants."[5] (*Id.* at 3.) The pages do *not* state that an officer should or should not administer any specific tests after an individual shows no signs of alcohol intoxication on the HGN test.[6] (*See id.* at 2–3.)

Cly argues that Manus should have known that his symptoms were "from the food poisoning that he described and the cold." (Doc. 33 at 20.) He further contends that "[t]he fact that

---

[5] CNS depressants are "medications that include sedatives, tranquilizers, and hypnotics[,]" that "are designed to slow your brain down, relax your muscles, and provide a sense of calm." *What to Know About CNS Depressants*, WebMD, https://www.webmd.com/brain/what-to-know-about-cns-depressants (reviewed June 9, 2021).

[6] Defendants move to strike the exhibit. (Doc. 35.) The Court will deny the motion as moot.

he passed the HGN test dissipated any suspicion of drug or alcohol use." (*Id.*) He cites *Soto-Cervantes* in support of his position, but that case concerned whether reasonable suspicion of drug activity garnered from a confidential tip dissipated during the officers' investigation. *See Soto-Cervantes*, 138 F.3d at 1322–23. He also quotes *Hinkle* for the proposition that "[i]nformation learned after developing probable cause but before an arrest can dissipate probable cause." (Doc. 33 at 33 (quoting 962 F.3d at 1221).) He does not, however, cite clearly established law that would have put the officers here on notice that arresting him under these circumstances violated his constitutional rights. (*See id.*)

Viewing the facts in a light most favorable to Cly, the Court finds that "[t]he totality of the circumstances confronting Officer [Manus] at the time [she] arrested [Cly] gave the officer probable cause to make the arrest." *See Martinez v. Brown*, No. 1:16-cv-00263 MCA/SCY, 2017 WL 3397385, at *5 (D.N.M. Mar. 21, 2017). Combined with the information gleaned from Marquart's report and from Manus's observations of Cly personally, Cly's "poor performance on [the field sobriety] tests could lead a prudent officer to believe that [Cly] was intoxicated." *See id.* (citations omitted). Cly has not met his burden to show that the officers here violated his constitutional rights or that any claimed right was clearly established. *See Halley*, 902 F.3d at 1144.

### C.   The Court will grant Defendants' motion on Cly's federal claims.

Having found that both the traffic stop and arrest of Cly were valid, the Court now turns to Cly's claims. He fails to clearly delineate his claims, but it appears that he brings five claims for violations of his federal constitutional rights: (1) racial discrimination; (2) false arrest/imprisonment[7]; (3) unlawful search of his person and vehicle; (4) malicious prosecution;

---

[7] Although Cly mentions false arrest and wrongful imprisonment separately, the Supreme Court has explained that "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Thus, the Court "refer[s] to the two torts together as false imprisonment." *Id.* at 389.

and (5) failure to train. (*See* Compl. ¶¶ 55–65.) Given that Cly cites only 42 U.S.C. § 1983 in his

Complaint, Defendants discussed the claims as federal claims. (*See* Doc. 27.) In his response brief,

Cly explained that he intended to bring his claims for malicious prosecution and false arrest/

imprisonment under the New Mexico Tort Claims Act, § 41-4-12. (*See* Doc. 33 at 10.) As Cly did

not respond to Defendants' arguments regarding malicious prosecution and false imprisonment

under federal law, the Court finds that he has waived any such claims and dismisses them with

prejudice.

Cly also mentions that the officers performed an "unlawful search" of his person and

vehicle, although he fails to clarify whether he brings the claim under federal or state law. (*See*

Compl. ¶¶ 53, 64.) Regardless, the parties failed to brief any claim of unlawful search, and the

Court declines to do so for them. The Court directs Cly to file a notice, no later than **Friday, May**

**13, 2022**, clarifying whether he brings the claim for unlawful search under federal or state law.

The Court now turns to Cly's allegations concerning racial discrimination and failure to train.

### 1.      Racial Discrimination

Cly asserts that McPherson and Manus made "discriminatory assumptions" that he "was

intoxicated . . . based upon racial targeting and stereotyp[ing]" due to his status as a Native

American. (Compl. ¶ 53.) "[T]he right to equal protection may be violated even if the actions of

the police are acceptable under the Fourth Amendment . . . ." *Marshall v. Columbia Lea Reg'l*

*Hosp.*, 345 F.3d 1157, 1166 (10th Cir. 2003). "Racially selective law enforcement violates this

nation's constitutional values at the most fundamental level . . . ." *Id.* (citations omitted). "To

withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial

discrimination in traffic stops and arrests must present evidence from which a jury could

reasonably infer that the law enforcement officials involved were motivated by a discriminatory

purpose and their actions had a discriminatory effect." *Id.* at 1168. "To satisfy the discriminatory-effect element, one who claims selective enforcement 'must . . . make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested . . . for the offense for which the defendant was [stopped or] arrested . . . .'" *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (quoting *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001)). "And the discriminatory-purpose element requires a showing that discriminatory intent was a 'motivating factor in the decision' to enforce the criminal law against the defendant." *Id.* (quoting *Marshall*, 345 F.3d at 1168). "Discriminatory intent can be shown by either direct or circumstantial evidence." *Id.* (citing *United States v. Deberry*, 430 F.3d 1294, 1299 (10th Cir. 2005)).

### a.      Discriminatory Purpose

Cly contends that "Manus immediately presumed he was drunk" upon encountering him because of his race. (Doc. 33 at 14.) Cly "is a member of the Navajo Nation and has the facial features of a Native American." (*Id.* (citing Doc. 33-12).) "Farmington adjoins the eastern border of the Navajo Nation[,]" and Cly believes Manus is familiar with Native Americans and "most certainly identified him as such." (*Id.*) He notes that the dispatch log listed the call as a "welfare check," which "is an exigent circumstance where an officer is engaged in his/her function as a community caretaker." (*Id.* at 15 (citing *Storey v. Taylor*, 696 F.3d 987, 996–97 (10th Cir. 2012)).) Cly contends that the officers' immediate decision to administer field sobriety tests "without giving [him] the slightest benefit of the doubt despite [his] representation that he was sick and the stop was supposed to be for a welfare check" is indicative of the officers' racial bias. (*See id.*)

Defendants note that the officers had no information about Cly's race when they responded to the call. (*See* Doc. 34 at 3 (citing Doc. 33-8).) Rather, Manus performed field sobriety tests

because of the tip provided to dispatch. (*See id.*) Cly's circumstantial evidence of intent is shaky at best. Even if Cly's evidence of discriminatory intent was sufficient to withstand summary judgment, a finding the Court does not explicitly make, he has not provided evidence to show discriminatory effect.

**b.    Discriminatory Effect**

To show the element of discriminatory effect, Cly "must make a credible showing that a similarly-situated individual of another race could have been, but was not, stopped or arrested for the offense for which [he] was stopped or arrested." *Alcaraz-Arellano*, 441 F.3d at 1264 (quotation omitted). Cly "may satisfy the 'credible showing' requirement by identifying a similarly-situated individual or through the use of statistical evidence." *United States v. Bernard*, No. CR 09-2474 RB, 2011 WL 13277499, at *3 (D.N.M. Dec. 9, 2011) (quoting *James*, 257 F.3d at 1179). Cly does not identify a similarly-situated individual but instead submits a 2015 article, presumably to provide statistical evidence. (*See* Doc. 33 at 15 (citing David Correia, *Police Violence Against Native People*, COUNTERPUNCH (June 9, 2015), https://www.counterpunch.org/2015/06/09/police-violence-against-native-people).)

This article is irrelevant to the issue here. It concerns police harassment and violence against Native people, and particularly against homeless Native Americans. *See* Correia, *supra*. The article provides no information or statistics regarding traffic stops or arrests of Native Americans as compared to other groups of people. *See id.* "[T]he proffered statistics must address the critical issue of whether that particular group was treated differently than a similarly-situated group." *James*, 257 F.3d at 1179 (citation omitted). Because Cly fails to offer evidence of a similarly-situated individual or of relevant statistical evidence of racial profiling or discrimination,

he has not alleged facts sufficient to withstand summary judgment. The Court will grant Defendants' motion on this claim.

### 2.      Failure to Supervise and Train

Cly alleges that the City failed to adequately train Manus as a drug recognition expert; failed to train officers to "corroborate information from informants and to look for independent evidence of intoxication before stopping and detaining suspects"; and failed to supervise and train officers regarding racial profiling and unlawful searches. (*See* Compl. ¶¶ 31, 45, 46, 60, 64.) To establish a claim against the City for failure to train or supervise, Cly must show: "(1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Because Cly has not established any constitutional violation of his rights regarding his arrest or for racial profiling, he also cannot establish a claim for failure to supervise or train related to those issues. Thus, the Court dismisses the claim in part. The claim remains to the extent it is brought pursuant to Cly's allegations of unlawful search, which the parties failed to brief.

### C.      Cly's state claims for false arrest, wrongful imprisonment, malicious prosecution, and unlawful search fail.

Cly alleges that he was subject to false arrest, wrongful imprisonment, and malicious prosecution in violation of NMTCA § 41-4-12. (Compl. ¶¶ 55–59; Doc. 33 at 10.) "New Mexico courts have repeatedly held that probable cause is fatal to false arrest and false imprisonment claims." *Hodge v. Bartram*, No. 1:20-CV-01212-WJ-JHR, 2021 WL 4150185, at *11 (D.N.M. Sept. 13, 2021) (citing *Dickson v. City of Clovis*, 242 P.3d 398, 404 (N.M. Ct. App. 2010) (noting the plaintiff's false arrest and false imprisonment claims were properly dismissed based upon a

finding of probable cause); *Benavidez v. Shutiva*, 350 P.3d 1234, 1241 (N.M. Ct. App. 2015) ("Probable cause to arrest for a single charge will suffice to immunize Defendants from Plaintiff's wrongful arrest claims."); *Santillo v. N.M. Dep't of Pub. Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007) ("An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest."). As the Court found that there was probable cause to arrest Cly, his claims for false arrest and false imprisonment fail.

"New Mexico has combined the torts of abuse of process and malicious prosecution into a single tort: malicious abuse of process." *Kerns v. Bd. of Comm'rs of Bernalillo Cnty.*, No. CV 07-0771 JB/WPL, 2015 WL 7873783, at *9 (D.N.M. Nov. 19, 2015) (citing *Devaney v. Thriftway Mktg. Corp.*, 953 P.2d 277, 283 (N.M. 1997), *abrogated on other grounds by Fleetwood Retail Corp. of N.M. v. LeDoux*, 164 P.3d 31 (2007)). To show malicious abuse of process, Cly must establish: "(i) 'the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge;' (ii) 'a primary motive in the use of process to accomplish an illegitimate end;' and (iii) damages." *Id.* (quoting *Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009)).

Regarding the first element, "[a]n improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process." *Id.* (quoting *Durham*, 204 P.3d at 26). Again, probable cause was present; thus, Cly must show some irregularity or impropriety. "A procedural impropriety under the tort of malicious abuse of process might arise if there was an improper use of criminal or civil process in a manner not contemplated by law." *Mata v. Anderson*, 685 F. Supp. 2d 1223, 1252 (D.N.M. 2010), *aff'd*, 635 F.3d 1250 (10th

Cir. 2011) (quoting *Weststar Mortg. Corp. v. Jackson*, 61 P.3d 823, 833 (N.M. 2002)). "There is no liability when the defendant in an abuse of process claim has done nothing more than carry out the process to its authorized conclusion, even if done with bad intentions." *Id.* (quoting *Weststar Mortg. Corp.*, 61 P.3d at 833). Cly argues that the City attorneys intended to intimidate him by filing a *nolle prosequi* instead of dismissing the charge. (Doc. 33 at 18.) Cly fails to cite authority to establish that filing a *nolle prosequi*, which is "a 'legal notice that a . . . prosecution has been abandoned[,]'" represents a conclusion that is unauthorized or not contemplated by law. *See Mata*, 685 F. Supp. 2d at 1252 n.10 (quoting Black's Law Dictionary 1074 (8th ed. 2004)). The *nolle prosequi* reflects that "while officers did have probable cause to make an arrest and charge [Cly] with DWI, the City is not able to prove the case beyond a reasonable doubt." (Doc. 33-11.) Cly offers no evidence to establish that any City employee intended to intimidate him but concludes this must be the case because he "is subject to being re-arrested until the statute of limitations has run on the crime alleged." (Doc. 33 at 11.) While this may be the effect of the *nolle prosequi*, he has not shown that this decision represents a procedural impropriety. Accordingly, the Court will grant Defendants' motion on this claim.

**D.    Cly states no claim against White.**

Defendants assert that White "is incorrectly named as a party," because he "was not even involved in the stop, testing or arrest." (Doc. 27 at 1, 6.) Cly responds that he initially believed that White participated, but "it appears that any participation by Officer White was minimal at best." (Doc. 33 at 16.) He states that "[a]t the appropriate time, [he] will consult with the Defendants as to dismissing [White] from this case." (*Id.*) The Court finds that time is now. As Cly has apparently abandoned any claim against White, the Court will dismiss all claim against White with prejudice.

**IV.    Conclusion**

The Court finds that McPherson had reasonable suspicion to conduct the traffic stop and Manus had probable cause to arrest Cly. The Court dismisses Cly's federal claims for racial discrimination, malicious prosecution, false imprisonment, and failure to train on the basis of any of these. The Court dismisses Cly's state claims for false arrest, false imprisonment, and malicious prosecution. Finally, the Court dismisses White from this lawsuit.

The only claims remaining are those for unlawful search and failure to train related to unlawful search. The Court directs Cly to file a notice, no later than **Friday, May 13, 2022**, clarifying whether he brings the claim for unlawful search under federal or state law.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment and Memorandum in Support (Doc. 27) is **GRANTED IN PART:** the federal claims for racial discrimination, malicious prosecution, false imprisonment, and failure to train on the basis of any of these are dismissed with prejudice; the state claims for false arrest, false imprisonment, and malicious prosecution are dismissed with prejudice; all other claims remain. The Court also dismisses with prejudice Defendant White;

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (Doc. 35) is **DENIED AS MOOT.**

.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE